**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**
**AT CINCINNATI**

| | |
|---|---|
| **R.L.K., by her next friends, individually and on behalf of all others similarly situated,** <br> 7288 Bobby Lane <br> Cincinnati, Ohio 45243 <br><br>     **Plaintiff,** <br><br> **v.** <br><br> **INDIAN HILL EXEMPTED VILLAGE SCHOOL DISTRICT,** <br><br> <u>Serve</u>: <br> c/o Superintendent Kirk Koennecke <br> 6855 Drake Road <br> Cincinnati, Ohio 45243 <br><br>     **Defendant.** | Case No. _____ <br><br> Judge: _____ <br><br> **CLASS ACTION COMPLAINT AND JURY DEMAND** |

**COMES NOW,** Plaintiff, R.L.K., by her next friends, individually and on behalf of all others similarly situated, and for her Class Action Complaint and Jury Demand against Indian Hill Exempted School District, states as follows:

## NATURE OF THIS ACTION

1.    Plaintiff brings this action individually by her next friends, and on behalf of all others similarly situated within the meaning of Civil Rule 23, against Defendant under Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. §794, *et seq.* ("Section 504") and Title II of the Americans with Disabilities Act of 1973, 42 U.S.C. §12131, *et seq.* ("Title II"), based on Defendant's knowing, and intentional acts and omissions at all times relevant to this Complaint, of refusing to accommodate students disabilities substantially

impacting one or more major life activity.

2.     Defendant's knowing and intentional acts and omissions described in this Complaint are part of uniformly applied official policies and practices, unofficial yet well-defined policies and practices, or a common mode of exercising discretion to deprive Plaintiff and all others similarly situated of their rights arising under Section 504 and Title II.

3.     Plaintiff seeks monetary relief, injunctive relief, reimbursement of her attorney's fees and costs, damages for emotional distress, statutory damages reimbursement of her out-of-pocket costs, punitive damages, equitable relief, and all other relief to which she and all others similarly situated are entitled.

4.     Plaintiff, individually and on behalf of all others similarly situated, further requests certification of the Class defined in this Complaint under Civil Rule 23.

## PARTIES, JURISDICTION, AND VENUE

5.     Plaintiff incorporates the preceding paragraphs of this Complaint as if fully rewritten.

6.     At all times relevant to this Complaint, Plaintiff, R.L.K., has been a minor child and resident of Hamilton County, Ohio.

7.     At all times relevant to this Complaint, Defendant Indian Hill Exempted Village School District has been a public school system located in Hamilton County, Ohio; has received funding from the United States Department of Education; and has maintained public school facilities at its Primary School ("IHPS"), Elementary School ("IHES"), Middle School ("IHMS"), and High School ("IHHS").

8.     This Court has personal jurisdiction over the parties to this action, and original subject matter jurisdiction over the controversy alleged in this Complaint under 28 U.S.C. §1331 and Civil Rule 23.

9.     This Court also has supplemental subject matter jurisdiction over all claims arising under state law under 28 U.S.C. §1367.

10.     Venue is appropriate in this Court under 28 U.S.C. §1391(b) as the facts, occurrences, transactions, and series of facts, occurrences, and transactions giving rise to this Complaint took place in this federal judicial District.

**FACTS**

**As to named Plaintiff R.L.K.**

11.     Plaintiff incorporates the preceding paragraphs of this Complaint as if fully rewritten.

12.     At all times relevant to this Complaint, Plaintiff has resided within the geographical and legal boundaries of the Indian Hill Exempted Village School District with her next friends, Parents, and legal guardians Rachel and Michael Katz (collectively "Parents" unless otherwise indicated).

13.     At all times relevant to this Complaint, Plaintiff has been a student IHPS or IHES and is in the fifth grade as of the date of the filing of this Complaint.

**2018-2019 School Year**

14.     Plaintiff incorporates the preceding paragraphs of this Complaint as if fully rewritten.

15.     In or around September 2018, when Plaintiff was a first-grader at IHPS, her

3

Parents enrolled her with Counselors at Queen City Counseling over concerns that Plaintiff lacked the emotional coping skills appropriate for a child of her age and development.

16.     Plaintiff's Counselors initially suspected that Plaintiff suffered from hyperactivity, and recommended medical intervention.  Plaintiff's Counselors emailed this sentiment to Plaintiff's Teachers on at least four occasions that school year.

17.     In March 2019, Plaintiff's Counselors informed her Parents that they believed she had been self-harming.

18.     In May 2019, Plaintiff met with a Psychiatrist who diagnosed Plaintiff with attention deficit disorder ("ADD") and recommended medication to treat the same.

19.     In May 2019, Plaintiff also began counseling with a Licensed Professional Clinical Counselor ("LPCC") for anxiety.

### 2019-2020 School Year

20.     Plaintiff incorporates the preceding paragraphs of this Complaint as if fully rewritten.

21.     On January 13, 2020, Ms. Katz emailed Plaintiff's Second Grade Teacher regarding her math grade dropping from a score of a "2" in the First Quarter to a "1" in the Second Quarter as follows:

> This weekend, we spent time with R.L.K. doing her sticky math sheets … and the thing is, she knows math. She knows the answer to all the problems and is able to work through the forms. The problem is with the timed element of the test. With R.L.K.'s diagnosis of ADHD and Anxiety, I believe it is time to officially request that she is tested for a 504 plan.

22.     That day, Plaintiff's Second Grade Teacher responded as follows:

4

Thank you for your email. I want to reassure you that the report card grade of a 1 is only referring to timed facts. Our 2nd grade standards require us to collect data on fact automaticity. R.L.K.'s math scores in all other areas (summative assessments, AIMSweb benchmarks, and daily participation) are meeting grade level standards.

There is no official test for a 504 plan. She has to qualify based on diagnoses, etc. I have cc'd our school counselor Ms. Oden so she can share the details of a 504 plan.

23.     Ms. Katz followed up as follows:

[Ms. Oden], I look forward to discussing with you. R.L.K. has been diagnosed with both ADHD and Anxiety. She takes medication for both. Please let me know what documentation you need from me to initiate the process to evaluate her needs. I can be reached via cell today and tomorrow.

I would like to have a phone conference regarding R.L.K.'s testing scores this week. But, if she has not had them yet--can you tell me if these specific tests are timed? If so, I would like to request an accommodation for that test.

Also, I would like to have you meet with R.L.K. to see if she struggles with math problems depending on how they are laid out: eg. if the numbers are stacked vertically versus written out lengthwise. I sat with her for over an hour doing sticky math this weekend and she seems to perform differently depending on how the equation is presented. AND if she is looking only at one equation at a time like, on a flash card, versus the whole sheet of equations, she has less anxiety and difficulty as well. That being said, I believe there are tests and assessments that need to be done.

24.     On January 16, 2020, Ms. Katz emailed Plaintiff's Second Grade Teacher as

follows:

Saw the email from you on the other string referencing the testing being completed for this week. I have not heard from Ms. Oden--is she supposed to be reaching out to me, or am I supposed to reach out to her?

Basically, I'm not feeling comfortable with where we left the discussion on our concerns about Ruby's math performance, and want to understand how we are going to address her struggles.

25.　　On January 17, 2020, Plaintiff's Second Grade Teacher emailed Ms. Katz regarding Plaintiff's MAP scores to the effect that she had no concern about Plaintiff's progress:

> She knows her facts when given time and we continue to practice this. I did give her addition and subtraction timed fact assessments this morning to check progress. She was on her own at my front table. She completed 26 additions in three minutes and 16 subtractions in 3 minutes. A significant improvement from her end of 2nd quarter assessment in which she completed 14 addition and 6 subtractions. I do believe 2nd grade is the last time fact fluency is assessed as a part of the report card.

> We can certainly meet to discuss a 504 plan. A 504 would not provide additional time on certain assessments (i.e. CogAT -Cognitive Abilities Test and timed tests) to name a couple. The norms of certain assessments require a time limit. Ms. Oden, our school counselor, has been testing small group students all week. I have included her on this email. Could you reply with a couple of dates and times that you would be available in the next two weeks to meet either via phone or in person, whichever you prefer?

26.　　On March 16, 2020, Defendant imposed a District-wide virtual learning policy due to the COVID-19 pandemic.

27.　　Plaintiff's School Counselor consulted with Plaintiff's LPCC regarding Plaintiff's counseling for anxiety on three occasions in March 2020. The LPCC reported that Defendant's competitive environment contributed to her stress and anxiety; that Plaintiff had a low self-assessment of her abilities as a student; and that Plaintiff reacted with inappropriate physical distress when addressing the same.

28.　　Plaintiff's School Counselor also reported to the Parents that Plaintiff was also inappropriately fixated on "being perfect."

29.　　During an April 1, 2020, conference, Defendant informed Plaintiff's Parents that Defendant had collected sufficient data to put a "504 Plan" in place for Plaintiff, and

promised to continue the evaluation process for six weeks.[1]  Plaintiff's Math Teacher also informed Plaintiff's Parents that Plaintiff had trouble with timed methods of fact fluency upon observing Plaintiff exhibiting signs of distress and anxiety related to the same during lessons and evaluation.

30.     Two weeks later, however, on April 14, 2020, Defendant unilaterally determined that Plaintiff didn't require a 504 Plan because according to Defendant, an ADD diagnosis alone didn't meet the standard for "emotional disturbance."  Instead, Defendant requested further diagnoses from Plaintiff's pediatrician for anxiety.

31.     Indeed, Defendant never completed its promised six-week assessment of Plaintiff's 504 Plan needs.

32.     When Plaintiff's Parents requested an explanation as to why Defendant failed to complete the promised six-week assessment, Defendant denied making this promise; insisted that such wasn't necessary; and resisted their efforts for further evaluation.

33.     Despite the zealous advocacy of Plaintiff's Parents, Defendant later falsely claimed that they agreed to terminate the 504 Plan assessment.

34.     On June 10, 2020, Plaintiff's Parents met with administrators to supply them with a letter from Plaintiff's pediatrician confirming Plaintiff's diagnosis of one or more disabilities, including without limitation, anxiety, which substantially affected Plaintiff in one or more major life activity, including without limitation, reading, writing,

---

[1] Generally stated, a 504 Plan is a written modification or accommodation needed by a disabled student to have equal access to the same education as non-disabled students.

learning, and studying, and requested appropriate accommodations for her.

35.     Defendants failed, however, to include the correspondence from Plaintiff's pediatrician in Plaintiff's file.

### 2020-2021 School Year

36.     Plaintiff incorporates the preceding paragraphs of this Complaint as if fully rewritten.

37.     In August 2020, Ms. Katz emailed Plaintiff's Third Grade Teacher with a request to meet to discuss Plaintiff's learning plan for Plaintiff  In the same email, Ms. Katz referred to the previously discussed 504 Plan process abandoned by Defendant.

38.     On August 30, 2020, Plaintiff's Third Grade Teacher responded that she spoke with Plaintiff's Second Grade Teacher, and asked that Plaintiff's Parents "see how things go and touch base in a few weeks."

39.     On September 2, 2020, Ms. Katz emailed Plaintiff's Third Grade Teacher with concerns that Plaintiff's anxiety is triggered by timed tests and requested alternate accommodations.  Ms. Katz also requested that Defendant identify an alternative to timed website tests, and again reiterated her request for documentation related to the previously-discarded Section 504 Plan.  Plaintiff's Third Grade Teacher responded that she would document Ms. Katz's request, but was silent as to any accommodations.  Later that day, Plaintiff's Math Teacher emailed Ms. Katz to inform her that Plaintiff hadn't completed her math or social studies assignments, and was again silent as to any accommodations.

40.     On September 28, 2020, Ms. Katz emailed Plaintiff's Third Grade Teacher

8

to confirm that a math and spelling test wouldn't be timed to avoid triggering Plaintiff's anxiety.

41.     Later that day, Plaintiff's Third Grade Teacher responded that she would conference with Plaintiff's Math Teacher, but was silent as to the requested 504 Plan.

42.     On February 2, 2021, Plaintiff's Math Teacher emailed Ms. Katz to inform her that Plaintiff had been skipping math class.  Ms. Katz immediately responded with a request for an update on Plaintiff's math performance, to which she received no response, but only a declaration that Plaintiff's Math Teacher would keep track of additional missed classes.

43.     On March 9, 2021, Plaintiff's Parents opted out of State testing because such tests are timed, and Defendant had failed to make any accommodations for her.

**2021-2022 School Year**

44.     Plaintiff incorporates the preceding paragraphs of this Complaint as if fully rewritten.

45.     In September 2021, Plaintiff's Fourth Grade Teacher informed her Parents that she was exhibiting significant symptoms of ADD.

46.     On September 24, 2021, Plaintiff's math and reading scores showed a significant decline.

47.     In October 2021, Plaintiff attended intensive outpatient therapy sessions with an LPCC-Supervisor ("LPCC-S") to assist her with emotional regulation and communication strategies.

48.     On October 27, 2021, Defendant's Playground Attendant accused Plaintiff

9

of bringing a "weapon" to school, which Plaintiff denies. Plaintiff brought a craft stick from the classroom to recess. Regardless, Defendant then put Plaintiff in "time out." Subsequently, Plaintiff was sent to the Principal's Office where she was falsely accused of intent to harm and threatened with suspension. The event and accusations triggered a substantial panic attack in Plaintiff.

49.     On November 3, 2021, Defendant conferenced with Plaintiff's Parents and promised to evaluate Plaintiff for appropriate accommodations under Section 504 and Title II based on its "fact-finding." Plaintiff's Parents advised Defendant that she would be evaluated by a Child Psychologist in addition to any psychological evaluation supplied by Defendant.

50.     On November 23, 2021, Plaintiff's Parents met with a Psychiatrist at Children's Hospital Medical Center ("CHMC") to perform the full psychological evaluation of Plaintiff.

51.     On November 29, 2021, Plaintiff's Parents emailed Defendant informing it that the intake process at CHMC had begun; that the ultimate assessment wouldn't be completed until February 2022; but that the existing diagnoses of anxiety, ADD, and depression coupled with Plaintiff's low-test scores should meet the requirements for accommodations on their own.

52.     Between January 18, 2022, and February 17, 2022, Plaintiff participated in intensive outpatient rehabilitation ("IOP") therapy to assist her with regulating her emotions.

53.   On January 24, 2022, CHMC evaluated Plaintiff for full psychological analysis.

54.   On February 14, 2022, Plaintiff's Parents received the Psychological Evaluation Report prepared by CHMC ("CHMC Report"). The Report concluded that Plaintiff suffers from several learning disabilities including without limitation adjustment disorder with mixed disturbances of emotions and conduct, growth failure, generalized anxiety disorder, disruptive mood disorder, intermittent explosive disorder, ADHD, oppositional defiance disorder, general language impairment, and instances of attempted self-harm, which substantially impacted Plaintiff in one or more major life activities.

55.   The CHMC Report further concluded that Plaintiff should receive six months of Speech and Language Therapy ("SLT") and Occupational Therapy ("OT") to determine the full breadth of her learning disabilities.

56.   The Parents immediately supplied Defendant with the CHMC Report and requested that Defendant implement its recommendations.

57.   Defendant, however, failed and refused to take any action recommended by CHMC or any of Plaintiff's other Healthcare Providers.

58.   On February 15, 2022, Plaintiff emailed Ms. Katz with the subject line "help," as follows verbatim:

> help me ples the techeris not waring a mask help me I also am doing good holding in my emotions but i am sard mom plles help me.

59.   On March 1, 2022, Ms. Katz emailed School Board President, Bear Tullis, requesting help, and shared the history of Plaintiff's difficulties to date. Mr. Tullis didn't respond to Ms. Katz's request for a conference to discuss the same.

60.     On March 2, 2022, Plaintiff suffered a severe panic attack at school and locked herself in a bathroom stall for twenty minutes, and later hid in a locker.

61.     At the urging of the Onsite Social Worker at CHMC, Plaintiff's Parents agreed to meet with Defendant's School Psychologist and begged Defendant to reengage in the 504 Plan evaluation process.

62.     On March 10, 2022, Defendant finally approved a 504 Plan for Plaintiff.

63.     Defendant, however, failed to implement the same 504 Plain it approved.

64.     On March 19, 2022, Plaintiff called Ms. Katz from school begging to be taken home because she believed Defendant's personnel were trying to harm her.

65.     On March 21, 2022, Plaintiff emailed Ms. Katz unintelligibly as follows verbatim:

> Dear, mom, thing's Are Fine At School we Stared DecmaAlis And we are almost Done with our super Hero Prioteit. I ess school's Fine A's All around Love Sooooo much mom xoxo Rk

66.     On April 22, 2022, Defendant forced Plaintiff to take a math test with a timer, contrary to the terms of the 504 Plan.

67.     On April 25, 2022, the CHMC Social Worker requested an update from Defendant regarding a positive reinforcement "game" that was to be implemented per the 504 Plan.  Defendant responded that no accommodation had been implemented at that point.

68.     On May 18, 2022, Plaintiff's Teachers were out with substitutes. Defendant failed to supply either substitute with the terms of the 504 Plan accommodations, leading Plaintiff to email Ms. Katz as follows, verbatim:

> mommy ples pick me up from school or the bus today I had a very bad day I am very sad I want you mommy. mommy help me.

69.     On May 19, 2022, IHES Principal Whitney Buell emailed Ms. Katz as follows regarding the debacle of the previous day:

> I am so sorry that this happened. This is not acceptable, and I will personally follow up with the substitutes and Hamilton County Consortium, who employ our substitutes. I will also follow up to make sure that our substitute plans include [R.L.K.'s] special needs. I appreciate you bringing this to my attention, and we will work to ensure that this does not happen again.

70.     On May 20, 2022, Plaintiff's Fourth Grade Teacher acknowledged to Plaintiff's Parents, that she and others have not supplied Plaintiff with the accommodations she's entitled to.

71.     Because the Defendant-approved 504 Plan was proving to be ineffective for Plaintiff, in no small part because Defendant failed and refused to implement it, on May 23, 2022, Plaintiff's Parents urgently requested that Defendant take further action, by without limitation, modifying the 504 Plan to include additional accommodations of Plaintiff's disabilities consistent with the recommendations of Plaintiff's Healthcare Providers.

72.     Plaintiff's Parents also requested that Defendant engage external auditors and consultants to examine Defendant's methods, policies, and procedures in responding to students requesting accommodations for their disabilities.

73.    Defendant, again, however, refused to act on any of the requests of Plaintiff's Parents.

74.    In June 2022, Plaintiff was admitted to CHMC for evaluation after an instance of attempted self-harm, which her Parents communicated to Defendant on August 31, 2022.

75.    Without limitation, Plaintiff's Parents also communicated the following on August 31, 2022, via the undersigned: (a) that CHMC reiterated its diagnoses of Plaintiff and generally agreed that she suffered from several learning disabilities that substantially affected one or more major life activities; (b) that per CHMC, Plaintiff doesn't demonstrate age-appropriate communication or language skills, including without limitation reading, spelling, and pronunciation skills, recognition of letter patterns and orthographic images (three-dimensional images in two-dimensional space), sentence formation, paragraph writing, page orientation, and mechanics, note-taking, pragmatic communication, and general social communication; (c) that the general impact of Plaintiff's diagnoses is her overall difficulty with concentration, completing tasks, learning, reading, and writing at a level appropriate for her age and development; (d) that Plaintiff's Healthcare Providers and Counselors had prescribed Plaintiff a host of medications, including without antipsychotics to treat her disabilities; (e) that Plaintiff's Healthcare Providers recommended ongoing collaboration between Plaintiff and her Parents on the one hand and Defendant on the other hand, to assist her with academic remediation, language therapy, and increased attention from her Teachers; and (f) that Plaintiff's Healthcare Providers further recommend additional accommodations,

14

including without limitation, evaluations for dysgraphia, a learning disability that affects writing abilities.

76.     Defendant, however, again refused to act.

77.     On October 3, 2022, a student who is not a resident of the District, assaulted Plaintiff at school.  The event was captured on video.  Despite that, Defendant punished Plaintiff instead of her attacker.  Plaintiff and her brother had previously reported the same out-of-district student for bullying without any response from Defendant, and without passing this information on to Plaintiff's Parents.

78.     In December 2022, Plaintiff's Parents enrolled Plaintiff in weekly SLT at their sole expense because Defendant refused to adopt the recommendations of Plaintiff's Healthcare Providers.

79.     On December 9, 2022, Plaintiff's Parents attended a conference with Defendant, at its behest, to discuss further actions and accommodations on behalf of Plaintiff.

80.     On December 16, 2022, Defendants informed Plaintiff's Parents that it would take no further action.

81.     As of the filing of this Complaint, Plaintiff and her Parents have incurred tens of thousands of dollars in medical expenses, transportation costs, and lost wages engaging with outside Healthcare Providers to supply Plaintiff with the assistance she needs, despite Defendant's obligation to supply the same.

## **Defendant's commitment to all students**
## **except for those with disabilities**

82.     Plaintiff incorporates the preceding paragraphs of this Complaint as if fully

rewritten.

83.     Defendant markets itself by boasting on its website its "2022 Quality Profile

for Indian Hill Schools" as follows:

> The story of the #IHPromise is one of determination and collaboration to
> be student-centered in every decision we make. Ranked consistently as one
> of the top-performing schools in Ohio and nationally, our singular focus is
> the nearly 2,200 young scholars we serve.
>
> After the passage of the May 2021 bond/operating levy, we – as a District –
> were presented with a unique opportunity to shape the future for
> generations of Braves. We entrenched ourselves in Building a Brave Future,
> not only with our construction project but also through our programming.
>
> During the fall of 2021, as we made history by breaking ground on the new
> Indian Hill Middle School building, we started to author the future of what
> a Brave educational experience could look like. With the input of more than
> 2,200 stakeholders, we curated our district's new 5-year strategic plan.
> Learners as Doers; Learners as Individuals; Learners as the Whole Child
> became the center of our focus.
>
> The result of our collaboration, our #IHPromise, is a K-12 masterpiece
> composed by students, alumni, parents, community members, teachers,
> staff, administrators, and with the full support of our Board of Education.
> With three focus areas and 10 initiatives over a five-year timeframe, it is a
> model of what K-12 education can look like when all stakeholders have a
> singular vision: students at the center. Within these pages of our 10th
> publication of the Quality Profile, you will see our plan in action. Our
> #IHPromise to you is to continue to provide the excellent educational
> experience you expect and deserve.

84.    Defendant further boasts on its website of its "fiscally conservative"

approach to selling educational services to students:

**Finance Committee presents unanimous recommendation to Indian Hill Board of Education**

The team of 10 dedicated Indian Hill School District residents who comprised the community-based Finance Committee made a unanimous recommendation to the Board of Education during the January 14 meeting. The recommendation comes after the committee invested eight months learning detailed information on school finance, and working directly with Treasurer Mick Davis to understand the financial position of the Indian Hill School District. Considering both the facilities and operational needs of the District, the recommendation is for the Board to consider placing a combined bond/operational levy on the ballot in November 2020 not to exceed six mills total, which – at most – would be an investment of approximately $210 annually for every $100,000 property value per the Hamilton County Auditor.

I want to personally thank each member of this committee; this was a significant task, and they have developed a fiscally conservative recommendation for the Board to consider that addresses the serious and substantial facilities issues we face while also sustaining and maintaining the excellent educational services we provide that make us uniquely Indian Hill," said Indian Hill School District Treasurer Mick Davis. In their recommendation to the Board of Education, the Finance Committee worked diligently to keep the millage as low as possible, and to also allow the Board flexibility as they take recommendations from both community-based committees into consideration.

The Finance Committee recommendation was built from guiding principles to optimize financial resources provided by Indian Hill School District taxpayers to benefit students, staff, and community members, and included the following goals: maintain unique programming; maintain student support services; maintain current student/teacher ratios; maintain transportation; maintain current extra-curricular programs. Additionally, the Finance Committee was dedicated to honoring the work of the District's community-based Facilities Steering Committee.

In October, after a year of extensive review, research, and analyses, the Facilities Steering Committee presented the Board of Education with four options to address needs for school facilities within the Indian Hill School District. The Facilities Steering Committee, a subcommittee of the

overarching Facilities Assessment Task Force that began in September of 2018, convened regularly through the end of September 2019 to develop the detailed analysis of capital needs at all District school buildings and facilities.

This recommendation of the Finance Committee honors and recognizes the Facilities Committee's research which showed the most critical facilities concerns are the needs facing Indian Hill Middle School. This recommendation addresses replacing Indian Hill Middle School, and funds the other critical facilities needs including increased security measures and aging mechanical equipment throughout the District," said Davis. Additionally, the Finance Committee spent significant time examining our operational needs. The District's last voter-approved operating issue was passed more than 25 years ago, and the District is approaching a need for additional dollars.

The Finance Committee recommended approximately 3.5 mills, 30-year term to provide $82 million for the bond issue to fix facilities; and approximately 2.4 mills on a five-year term operation levy. No decisions have been made. The Board of Education members will take the recommendations into consideration, and seek additional input.

It is important to note that no official action has been taken, and the Board of Education will consider all findings by both committees before any decisions are made, said Indian Hill Superintendent Kirk Koennecke. We will continue to keep the community updated on progress as our Board members consider these recommendations that are the result of much research and analysis by our biggest investors, our community members. We thank all members of both committees who did this work.

85.    Defendant's CEO and Superintendent Kirk Koennecke states on

Defendant's website:

In the world of education, business is personal. Within the Indian Hill School District, we strive to understand each child's individual passion and pair that with purpose and opportunity both inside and outside of our classrooms. From our academics, to our arts, to our athletics – it is the mission of our District to provide exceptional educational services to ensure the intellectual development, personal growth, and social responsibility of each student.

We do it with a commitment to excellence; collaborative relationships; community engagement; and continuous improvement – always with a

vision of Enduring Excellence in Learning, Leadership, Innovation, and Service. We do it at a level that is nationally recognized.

Being a Brave is to model the way.

Our collective #IHPromise to you is to create magic for our students in the classroom.

...

It is a business that is deeply personal. And, we thank you for trusting us to be excellent in our service to your child.

86. Clicking on the "Our Promise" tab on Defendant's website leads to bold graphics boasting that (a) its ACT Composite for the Class of 2022 was 27.2, seven points above the national average; (b) its top ranking in 2023 as Ohio's "#1 School"; (c) its 27 Advanced Placement courses; and (d) that 400 musicians participate in its national-recognized music program.

87. Noticeably absent from Defendant's website is any discussion of its obligations, promises, and duties to students who require disability accommodations under Section 504 and Title II. Indeed, clicking on the "ADA" tab at the bottom of the home page of Defendant's website leads only to a statement of the website's copyright protections and disclaimer of any liability for links posted on the same. If the reader squints, however, she may notice a single reference to Defendant's Section 504 Coordinator.

## CLASS ALLEGATIONS

88. Plaintiff incorporates the preceding paragraphs of this Complaint as if fully rewritten.

89. In accordance with Civil Rule 23, Plaintiff seeks certification of the following

19

Class for claims arising under Section 504 and Title II for Defendant's failure to accommodate students with qualifying disabilities:

> Defendant's current and former students within the four years preceding the filing of this Complaint: (a) between the ages of five and twenty-two years old; (b) who sufferer or suffered from one more qualifying disability that substantially affects or affected one more major life activity; (c) who are or were entitled to one or more accommodations; and (d) to whom Defendant has denied accommodations pursuant to a uniformly applied official policy or policies, an unofficial yet well-defined practice or practices, or a common mode of exercising discretion to deny the same.

90. To be excluded from the Class are (a) Defendant's current and former employees, officers, and directors, (b) students of Defendant's current and former employees, officers, and directors, (c) the undersigned counsel, and (d) the Judge and courtroom staff to whom this action is assigned.

91. Upon information and belief, there are hundreds or thousands of members of the Class making the Class Members so numerous that joinder of all is impracticable within the meaning of Civil Rule 23(a)(1). Despite the size of the Class, the Members of the same can be easily identified from records under Defendant's exclusive possession, custody, and control. Plaintiff's Parents and the undersigned therefore don't anticipate any difficulties managing the size of the Proposed Class.

92. There are questions of law and fact common to the Class within the meaning of Civil Rule 23(a)(2), specifically and without limitation:

A. Whether Class Members suffer or suffered from one or more qualifying disabilities substantially impacting one or more major life activities;

B. Whether Class Members are or were entitled to an accommodation for a qualifying disability;

20

C.     Whether Class Members requested accommodations;

D.     Whether Defendant denied Class Members accommodations for qualifying disabilities to which they are or were entitled, pursuant to a uniformly applied official policy or policies, an unofficial yet well-defined practice driving the same, or a common mode of exercising discretion to deny the same;

E.     Whether Defendant has the authority to implement any official policy or policies, unofficial yet well-defined practice, or common mode of exercising discretion to deny Class Members an accommodation to which they are otherwise entitled;

F.     Whether Class Members are entitled to monetary relief; and

G.     Whether Defendant should be enjoined from implementing and following any official policy or policies, unofficial yet well-defined practice, or common mode of exercising discretion to deny Class Members an accommodation under Section 504 and Title II.

93.     The claims of the Proposed Class Representative under Section 504 and Title II are typical of the Class claims within the meaning of Civil Rule 23(a)(3).

94.     The Class as defined in this Complaint doesn't contain Class Members with significantly conflicting interests.

95.     The Parents of the Class Representative will fairly and adequately protect the interests of Class Members within the meaning of Civil Rule 23(a)(4).

96.     Prosecuting separate actions by individual Proposed Class Members would create a risk of (a) inconsistent or varying adjudications with respect to individual Class

Members that would establish incompatible standards of conduct for Defendant; and (b) adjudications with respect to individual Class Members that, as a practical matter, would be dispositive of the interests of the other Class Members not parties to the individual adjudications would substantially impair or impede their ability to protect their interests within the meaning of Civil Rule 23(b)(1).

97.     Defendant has acted or refused to act on grounds described in this Complaint that apply generally to Class Members so that final injunctive relief or corresponding declaratory relief is appropriate respecting the Class as a whole within the meaning of Civil Rule 23(b)(2).

98.     Questions of law or fact common to Class Members predominate over any questions affecting only individual Members, and a Class Action is superior to other available methods for fairly and efficiently adjudicating the controversy within the meaning of Civil Rule 23(b)(3), for without limitation the following reasons:

A.     That individual Class Members may be unaware of their rights arising under Section 504 and Title II;

B.     That individual Class Members may not have the resources to pursue relief under Section 504 and Title II;

C.     That even if individual Class Members have the resources to pursue relief under Section 504 and Title II, the process of pursuing that relief may be unduly burdensome in light of the potential relief they're entitled to;

D.     That proceeding as a Class will be less burdensome to the courts in which individual relief may be pursued;

E.     That proceeding as a Class will minimize the delay and expense of resolving Defendant's unlawful acts and omissions described in this Complaint; and

F.     That even if Class Members aren't entitled to monetary relief under Section 504 and Title II, the Class as defined in this Complaint may still be certified under Civil Rule 23(b)(2) in that Defendant has acted or refused to act on grounds generally applicable to all Class Members, thereby making final and declaratory corresponding injunctive relief appropriate and applicable Class-wide.

## CAUSE OF ACTION COMMON TO CLASS MEMBERS

### Count I
### Violation of 29 U.S.C. §794, *et seq*. and
### 42 U.S.C. §12131, *et seq*.:
### Intentional Failure to Accommodate

99.     Plaintiff incorporates the preceding allegations of this Complaint as if fully rewritten.

100.     Section 504 provides at 29 U.S.C. §794(a), in pertinent part:

No otherwise qualified individual with a disability ... shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.

101.     Title II provides at 42 U.S.C. §12132, in pertinent part:

No qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.

102.     At all times relevant to this Complaint, Defendant has received federal financial assistance and has been a "public entity" within the meanings of Section 504 and Title II.

23

103.    At all times relevant to this Complaint, Defendant was obliged to supply Plaintiff and Class Members access to its programs "alongside their non-disabled peers to the maximum extent appropriate," and to ensure that they "remain in the general education environment absent a showing that they cannot be satisfactorily educated there despite the provision of supplementary aids and services," under Section 504 at 34 C.F.R. §104.34(a).

104.    At all times relevant to this Complaint, Defendant was obliged to "administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities," including without limitation Plaintiff and Class Members under Title II, at 28 C.F.R. §35.130(d). The "most integrated setting" under Section 504 and Title II is one that enables Plaintiff and Class Members to interact with non-disabled persons to the fullest extent possible.

105.    At all times relevant to this Complaint, Section 504 and Title II further obliged Defendant to ensure that Plaintiff and Class Members had "meaningful access" to its programs by offering them reasonable accommodations by modifying its policies, practices, and procedures.

106.    At all times relevant to this Complaint, Plaintiff and Class Members were "disabled" and/or "handicapped" within the meaning of Section 504 and Title II.

107.    At all times relevant to this Complaint, Plaintiff and Class Members were otherwise qualified for participation in Defendant's programs with or without an accommodation.

108. At all times relevant to this Complaint, Defendant treated Plaintiff and Class Members less favorably than non-disabled students because of their disabilities by failing to offer them a reasonable accommodation, in that Defendant excluded them from participation in, denied them the benefits of, or subjected them to discrimination in the administration of its programs solely because of their handicaps or disabilities.

109. At times relevant to this Complaint, Plaintiff and Class Members requested, and/or were entitled to reasonable accommodations of their disabilities within the meaning of Section 504 and Title II.

110. At times relevant to this Complaint, the accommodations requested by Plaintiff and Class Members would have placed no meaningful burden on Defendant within the meaning of Section 504 and Title II.

111. At all times relevant to this Complaint, Defendant intentionally failed to accommodate the disabilities of Plaintiff and Class Members, despite knowing the consequential limitations placed on them by their disabilities, and that such accommodations would have placed no meaningful burden on it.

112. At all times relevant to this Complaint, Defendant intentionally failed to engage in good faith in the "interactive process" with Plaintiff and Class Members to try to reach a reasonable accommodation of their disabilities, as is mandatory under Section 504 and Section II.

113. At all times relevant to this Complaint, Defendant's motivation in intentionally denying Plaintiff and Class Members a reasonable accommodation was, without limitation:

A.    Maintaining the image it holds out to the public as an elite public school system that matriculates students to equally elite colleges and universities;

B.    Persuading taxpayers to continue approving millions of dollars in tax levies;

C.    Persuading parents of means to enroll their children in the District;

D.    Preferring to dedicate its substantial resources exclusively to (i) its elite college preparatory and advanced placement curricula, and (ii) building and maintaining its facilities, athletic programs, and music programs;

E.    Discouraging Parents of students with disabilities like Plaintiff and Class Members from enrolling their children in the District to avoid the expense of dedicating any resources to those students; and

F.    Funding its sophisticated and expensive marketing budget, to the exclusion and detriment of students with disabilities like Plaintiff and Class Members.

114.    At all times relevant to this Complaint, Defendant could have reasonably accommodated the disabilities of Plaintiff and Class Members but failed to, and such failure impeded their ability to participate in or benefit from, Defendant's programs.

115.    As a direct and proximate result of Defendant's intentional failure to accommodate the disabilities of Plaintiff and Class Members, and to engage in the mandatory interactive process in violation of Section 504 and Title II, Plaintiff, and Class Members have suffered damages in excess of the jurisdictional threshold of this Court as to be determined by the trier of fact.

26

**CAUSES OF ACTION SPECIFIC TO PLAINTIFF**

**Count II**
**Violation of 29 U.S.C. §794, *et seq*. and**
**42 U.S.C. §12131, *et seq*.:**
**Intentional Discrimination Based on Disability**

116.    Plaintiff incorporates the preceding allegations of this Complaint as if fully rewritten.

117.    At all times relevant to this Complaint, Defendant has subjected Plaintiff to discrimination solely because of her disabilities within the meaning of Section 504 and Title II.

118.    As a direct and proximate result of Defendant's intentional discrimination against Plaintiff solely because of her disabilities in violation of Section 504 and Title II, Plaintiff and her Parents have suffered damages in excess of the jurisdictional threshold of this Court to be determined by the trier of fact.

**Count III**
**Violation of 29 U.S.C. §794, *et seq*. and**
**42 U.S.C. §12131, *et seq*.:**
**Retaliation**

119.    Plaintiff incorporates the preceding allegations of this Complaint as if fully rewritten.

120.    At all times relevant to this Complaint, and as discussed above, Plaintiff and her Parents engaged in legally protected activity under Section 504 and Title II, including without limitation by:

      A.    Advocating for Defendant to accommodate Plaintiff's disabilities;

      B.    Objecting to Defendant's intentional discrimination against Plaintiff

based solely on her disabilities;

        C.      Objecting to Defendant directing punishment at Plaintiff for alleged infractions of neutral policies based solely on her disabilities; and

        D.      Objecting to Defendant's failure to enforce infractions of neutral policies committed by non-disabled students, including without limitation, infractions directed at Plaintiff.

121.   At all times relevant to this Complaint, and as discussed above, Defendant knew about, appreciated, and understood that Plaintiff and her Parents engaged in the legally protected activity within the meaning of Section 504 and Title II.

122.   As a direct and proximate result of Defendant's retaliation against Plaintiff in violation of Section 504 and Title II, Plaintiff and her Parents have suffered damages in excess of the jurisdictional threshold of this Court to be determined by the trier of fact.

## <u>Count IV</u>
## Intentional Infliction of Emotional Distress

123.   Plaintiff incorporates the preceding allegations of this Complaint as if fully rewritten.

124.   At times relevant to this Complaint, and as described above, by its acts and omissions, Defendant either intended to cause Plaintiff emotional distress, knew, or should have known that its acts and omissions would result in serious emotional distress to Plaintiff.

125.    At times relevant to this Complaint, and as described above, Defendant's acts and omissions were so extreme and outrageous as to go beyond all possible bounds of decency and were such that it can be considered utterly intolerable in a civilized community.

126.    At times relevant to this Complaint, and as described above, Defendant's acts and omissions directly and proximately caused Plaintiff emotional and psychic injuries serious enough and of a nature that no reasonable person could be expected to endure the same, within the jurisdictional threshold of this Court to be determined by the trier of fact.

## **Count V**
### **Negligence**

127.    Plaintiff incorporates the preceding allegations of this Complaint as if fully rewritten.

128.    At all times relevant to this Complaint a "special relationship" existed between Defendant and Plaintiff in that by Defendant's knowing and intentional acts and omissions described above, and as imposed by federal law under Section 504 and Title II, (a) Defendant assumed an affirmative duty to act in Plaintiff's best interests while she was in its care; (b) Defendant knew, or reasonably should have known that its acts and omissions described in this Complaint would and/or could harm Plaintiff in the manner described above; (c) Defendant had direct contact with Plaintiff; and (d) Plaintiff and her Parents justifiably relied on Defendant's acts, omissions, and representations described in this Complaint, and were entitled to do so.

129.    As described in this Complaint, by its acts, omissions, and representations, Defendant breached its affirmative duty to act in Plaintiff's best interests without justification, and in a manner constituting negligence under Ohio law.

130.    As a direct and proximate result of Defendant's negligence described in this Complaint, Plaintiff has suffered damages in excess of the jurisdictional threshold of this Court to be determined by the trier of fact.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff R.L.K., by and through her next friends, Parents, and legal guardians Rachel and Michael Katz, individually and on behalf of all others similarly situated, prays for judgment against Defendant Indian Hill Exempted Village School District as follows:

A.  Certification of this action as a Class Action pursuant to Civil Rule 23;

B.  That Plaintiff may proceed as Class Representative of the Class, and counsel may proceed as Class Counsel;

C.  Compensatory damages;

D.  Damages in the form of emotional distress;

E.  Statutory damages;

F.  Liquidated damages;

G.  Injunctive relief by enjoining Defendant, its agents, successors, and employees from continuing or maintaining the policies, practices, customs, and usages of denying, abridging, withholding, conditioning, limiting, or otherwise

interfering with Plaintiff's right to disability accommodations under Section 504 and Title II, as well as the same rights of all person's similarly situated;

H. Equitable relief;

I. Pre- and post-judgment interest on all damages;

J. An award of their out-of-pocket expenses;

K. An award of lost wages;

L. An award of their attorney's fees, and costs;

M. An award of punitive damages; and

N. Such other relief the Court deems appropriate.

## JURY DEMAND

Plaintiff demands a jury trial on all issues so triable.

Respectfully submitted,

*/s/ Justin Whittaker*
Justin Whittaker, Esq. (0093212)
WHITTAKER LAW, LLC
1431 Walnut Street
Cincinnati, Ohio 45202
Tel: (513) 259-3758
Fax: (513) 436-0698
Justin@WhittakerLawFirm.com

Counsel for Plaintiff R.L.K.,
by her next friends, Parents, and legal guardians, Rachel and Michael Katz, individually and on behalf of all others similarly situated